**U.S. Department of Justice**



.Office of the
Deputy Assistant Attorney General

*Washington, D.C. 20530*

MEMORANDUM

MAY 23 1986

TO:    H. Gerald Staub
Office of Chief Counsel
National Aeronautics and Space Administration

From:    Samuel A. Alito, Jr.
Deputy Assistant Attorney General
Office of Legal Counsel

SUBJECT:    Emoluments Clause Questions raised by NASA
Scientist's Proposed Consulting Arrangement
with the University of New South Wales

This responds to your request of April 10, 1986, for our views as to whether there is any constitutional obstacle to a NASA employee's accepting a fee for the performance of certain consulting services for a foreign university. Specifically, you wish to know whether a NASA scientist may accept an invitation from the University of New South Wales to review a thesis submitted by an Australian Ph. D. candidate. The total amount of the remuneration for this service would be $150. The question is whether the employee's acceptance of the $150 consulting fee would violate the Emoluments Clause of the Constitution, Article I, section 9, clause 8. Based on our understanding of the facts in this situation, including the relationship between the University of New South Wales and the government of Australia, we conclude that there would be no constitutional violation.[1]

Article I, section 9, clause 8 provides:

> No Title of Nobility shall be granted by the United States: and no Person holding any Office of Profit or Trust under them, shall, without

---

[1] This opinion addresses only the constitutional issue raised under Article I, section 9, clause 8, and does not purport to deal with other statutory or regulatory restrictions that may be implicated by your employee's proposed consultancy. We assume that your office has considered whether the consultancy would be permissible under applicable NASA regulations governing outside employment by agency employees.

the consent of Congress, accept of any present, Emolument, Office or Title, of any kind whatever, from any King, Prince, or foreign State.

This clause was adopted unanimously at the Constitutional Convention as a means of preserving the independence of foreign ministers and other officers of the United States from external influences. 3 J. Madison, Papers 1408 (1840). Its purpose, as explained by Governor Randolph during the ratification debate in the Virginia Convention, is "to exclude corruption and foreign influence [by prohibiting] any one in office from receiving or holding any emoluments from foreign states." 3 M. Farrand, The Records of the Federal Convention of 1787, at 327 (1966 ed.) See also 2 M. Farrand, supra, 389.[2] Thus the Emoluments Clause is "directed against every kind of influence by foreign governments upon officers of the United States," (24 Op. A.G. 116, 117 (1902)), unless the payment has been expressly consented to by Congress. See 5 U.S.C. 7342.

The individual who has been offered the consultancy is a full-time permanent employee of NASA and thus occupies an "Office of Profit or Trust under [the United States]" as that phrase is used in the Emoluments Clause.[3] Moreover, a stipend or consulting fee from a foreign government would ordinarily be

---

[2] Governor Randolph referred to the incident that apparently precipitated the enactment of the clause: King Louis XIV's presentation of a snuffbox to the departing Ambassador Franklin. See H. Grigsby, History of the Virginia Federal Convention of 1788, contained in 9 Virginia Historical Society Collections (New Series) 264.

[3] See, e.g., 27 Op. A.G. 219 (1909)(Clerk of Class 4 in the Post Office holds an office of profit or trust for Emoluments Clause purposes, since he "holds his appointment from the head of a Department. . ., receives for his services a fixed compensation from moneys appropriated for the purpose by Congress, . . . has regularly prescribed services to perform, and his duties are continuing and permanent, and not occasional and temporary"). See United States v. Hartwell, 73 U.S. (6 Wall.) 385, 395 (1867)(the concept of office "embraces the ideas of tenure, duration, emoluments, and duties").

considered an "emolument" within the meaning of the constitutional prohibition.[4]   The question in this case, however, is whether the consulting fee from the University of New South Wales can be said to be from a "foreign state."

We have found no judicial opinions construing the Emoluments Clause in which the identity of the source of an emolument was at issue; nor have we found any discussion of this issue in any relevant commentary.[5]   In the absence of any authoritative guid-ance, but with the underlying purpose of the constitutional prohibition in mind, we have relied for our analysis on the factual circumstances of the proposed consultancy.

---

[4] See 6 Op. A.G. 409 (1854)(United States Marshal may not accept compensation for acting as commercial agent of France); 40 Op. A.G. 513 (1947)(clause would preclude Irish government from paying the salaries of detailed U.S. government employees, were it not authorized by legislation); Memorandum from the Deputy Assistant Attorney General, Office of Legal Counsel, to the Assistant General Counsel, Nuclear Regulatory Commission, February 24, 1982 (clause prohibits employee of NRC from undertaking paid consultancy with Mexican government).  See also Hoyt v. United States, 51 U.S. (10 How.) 109, 135 (1850)("...the term emoluments, that being more comprehensive, and embracing every species of compensation or pecuniary profit derived from a discharge of the duties of the office"); Sherburne v. United States, 16 Ct. Cl. 491, 496 (1880)("emoluments . . . are indirect or contingent remuneration, which may or may not be earned, and which is sometimes in the nature of compensation, and sometimes in the nature of reimbursement.")

[5] This Office has on two previous occasions considered whether a proferred "emolument" was "from" a foreign government.  In a August 11, 1980, memorandum for the General Counsel of the Comodities Futures Trading Commission, we concluded that a government official could be reimbursed by Harvard University for travel expenses from funds paid under a consultancy contract with the government of Indonesia by which Harvard provided expert consultants on a variety of issues.  There, the foreign government had no control over the selection of experts and their payment, which matters were entirely within the discretion of the University.  By contrast, in the February 24, 1982, opinion for the Nuclear Regulatory Commission cited above in the text, we concluded that the Emoluments Clause could not be avoided by channeling funds from the foreign government through a consulting firm that had been established apparently for the sole purpose of providing the consulting services at issue.  There, the facts suggested that the retention of the NRC employee by the consulting firm was the principal reason for selection of the firm by the Mexican government.

Our understanding of the facts is based on the descriptive material included in your letter of April 10, as amplified in subsequent conversations between our staff and personnel at the Australian Embassy.

The University of New South Wales was established pursuant to a 1949 Act of the legislature of the state of New South Wales, Australia. It is governed by a Council, which consists of 44 elected and appointed members. Two members are so-called "parliamentary members," or members of the state government of New South Wales; 21 members are elected from within the University community to represent the administration, faculty, and student body; and 21 members are appointed by the Minister of Education of New South Wales, who is an elected member of the state legislature, to represent various interest groups, including business, the professions, and trade unions.

Under the University's organic act, the Council has complete power over the University's academic program, the appointment and termination of faculty and other employees, and the management of the affairs, property and funds of the University. In general, it "may act in all matters concerning the University in such manner as appears to it best calculated to promote the objects and interests of the University." Act No. 11, 1949, s. 25, reprinted in the Calendar of the University for 1981. There is no provision in the law for review of any of the Council's decisions by any state agency or official. It would appear, therefore, that although a bare majority of members of the Council consists of state officials or their appointees, the Council itself acts entirely independently of the state government in making decisions affecting the management and academic governance of the University.

While the University's governing body reflects state and local interests, its finances are derived from and controlled entirely by the federal government. Like other public universities in Australia, the University charges no tuition or fees to its students, and no state or local taxes are levied for its support. All of the University's funding comes directly from the Australian federal government, and decisions relating to the level and general allocation of that funding are made by the Australian Tertiary Education Commission, subject to review by the Australian Parliament.

Given its source of financial support and governing structure, the University of New South Wales is clearly a public institution. However, it is not so clear that it should necessarily be regarded as a "foreign state" for Emoluments Clause purposes, given its functional and operational separation and independence from the government of Australia and state political instrumentalities. The answer to the Emoluments Clause question in this particular situation must depend, we

- 4 -

believe, upon a further inquiry into the circumstances of the proposed consultancy, to determine whether the consultancy would raise the kind of concern (viz., the potential for "corruption and foreign influence") that motivated the Framers in enacting the constitutional prohibition.

We turn now to those particular facts, as you have described them to us. The NASA scientist was selected by the University of New South Wales to review the Ph.D. thesis because of his international reputation as a scholar in the field to which the thesis relates, and not because of his position with the U.S. government.[6] The invitation was extended to him on University letterhead by the chairman of the academic department in which the Ph.D. candidate is enrolled. The $150 consulting fee is apparently to be paid from funds made available to departments of the University for this purpose and is in an amount ordinarily paid by departments to outside experts for services of this kind. The thesis to be reviewed will be sent directly to the NASA scientist in this country, and he will review it here on his own time and submit a written report to the University. There does not appear to be any reason for him to have any direct contact with officials of the University during the course of the consultancy, and you expect that he will not. The consultancy is by its terms limited both in time and in substantive scope, and you do not anticipate that there will be any continuing relationship between the University and the NASA employee after the consultant's report has been submitted.

Considering the factual setting described above in light of the Framers' concerns expressed in the Emoluments Clause, we do not believe that it presents the opportunity for "corruption and foreign influence" that concerned the Framers and that we must presume exists whenever a gift or emolument comes directly from a foreign government or one of its instrumentalities. We therefore conclude that the NASA employee's acceptance of the consultant's stipend from the University in this case would not be prohibited by the Emoluments Clause.

---

[6]The field in question involves the measurement of components of the atmosphere. The Ph.D. thesis deals with the use of inversion methods for aerosol remote sensing.